**SEAWAY PORT AUTHORITY OF DULUTH, Respondent,**

v.

**MIDLAND INSURANCE COMPANY, Reserve Insurance Company, Respondents (C3-88-141), Appellants (C9-88-810),**

**Excess Insurance Company, Ltd., et al., Appellants (C3-88-141), Respondents (C9-88-810),**

**Minnesota Insurance Guaranty, Respondent.**

No. C3-88-141.

Court of Appeals of Minnesota.

Oct. 11, 1988.

Charles B. Bateman, Eric D. Hylden, Duluth, for Seaway Port Authority of Duluth.

Thomas A. Pearson, Minneapolis, for Midland Ins. Co.

David P. Sullivan, Sullivan & Setterlund, Ltd., Duluth, for Reserve Ins. Co.

Richard E. Prebich, Abate, Wivoda, Clark, et al. Hibbing, Richard E. Mueller, Hugh C. Griffin, Paul J. Peralta, Lord, Bissell & Brook, Chicago, Ill., for Excess Ins. Co., Ltd.

Minnesota Ins. Guar., James Kelly, Edina, pro se.

Heard, considered and decided by FOLEY, P.J., and CRIPPEN and SHORT, JJ.

## OPINION

SHORT, Judge.

Respondent Seaway Port Authority of Duluth (SPAD) brought an action for declaratory judgment against respondents Midland and Reserve Insurance Companies and appellant Excess Insurance Company to determine which of the insurance companies was liable to pay SPAD's costs in defending a number of lawsuits arising out of a bond default. The trial court declared all three insurance companies jointly and severably liable for all of SPAD's losses, and ordered Midland and Reserve to pay SPAD's costs and attorney fees in the declaratory judgment action. Excess Insurance argues on appeal that it is not liable for SPAD's losses. Midland and Reserve challenge the portion of the judgment requiring them to pay SPAD's costs and attorney fees. They also argue that the trial court lacked subject matter jurisdiction to consider the claims against them, that some of SPAD's losses are not covered by their policies, and that the trial court improperly computed prejudgment interest.

We reverse the portion of the judgment holding Excess jointly liable for SPAD's costs of defending the bond lawsuits. We also reverse the portion of the judgment requiring Midland and Reserve to reimburse SPAD for its costs in defending certain mechanics lien actions. We remand the case for recomputation of the damages against Midland and Reserve. The remainder of the judgment is affirmed.

## FACTS

This case revolves around three "Public Officials Liability" insurance policies purchased by the Seaway Port Authority of Duluth (SPAD). On July 23, 1975, SPAD purchased a policy from Reserve Insurance Company (Reserve), covering SPAD for losses arising out of claims made against SPAD for "wrongful acts" during the period from July 23, 1975 to July 23, 1978. The policy defined "wrongful act" as "any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty including misfeasance, malfeasance and non-feasance by the Insureds in the discharge of their duties * * *." The coverage was limited to $250,000 per "occurrence" with a $1,000,000 annual aggregate limit and a $2,500 per claim deductible.

On April 1, 1976, SPAD purchased a new liability policy from Midland Insurance Company (Midland). This policy covered losses arising from "wrongful acts" up to $1,000,000 per loss with a $1,000,000 annual aggregate limit and a $5,000 deductible per loss, for a period from April 1, 1976 through April 1, 1979. The definition of "wrongful act" in the Midland policy is the same as the definition in the Reserve policy.

SPAD also purchased an "Excess Public Official Liability Policy" from Excess Insurance Company (Excess). The provisions in dispute are part "C" of the "Declarations":

C. LIMITS OF LIABILITY: (1) $750,000 each occurrence
(2) $1,000,000 in the annual aggregate
But only in excess of: (3) $250,000 each occurrence
(4) $1,000,000 in the annual aggregate

and part II of the body of the policy:

## II. LIMITS OF LIABILITY

(a) The Underwriters' limit of liability for any loss hereunder shall be the amount shown in item C(1) of the Declarations in respect of each occurrence and the maximum liability of the Underwriters hereon in respect of each Policy year shall not exceed the amount shown in item C(2) of the Declarations as aggregate.

(b) The Underwriters hereon shall only be liable hereunder for any loss after the Primary Policy has admitted or has been held liable to pay the amounts shown in item C(3) of the Declarations in respect of each occurrence or the amount shown in item C(4) of the Declarations in respect of each policy year as aggregate.

SPAD's claims under these three insurance policies arose from a default on industrial revenue bonds SPAD issued for construction of a malic acid [1] plant. Bondholders filed a series of lawsuits beginning in May 1976, alleging that SPAD had underestimated the cost of the project and failed to secure other necessary financing, and that both of these problems caused the plant's failure and the bond default. The Securities and Exchange Commission (SEC) also began an investigation.

SPAD settled one lawsuit for $20,000. SPAD was eventually dismissed from the other actions, but alleges that it spent $81,550.26 in attorney fees defending itself.

While the bond litigation was pending, SPAD gave notice of its claims to Reserve, Midland and Excess, and requested defense or reimbursement of defense costs. Reserve and Midland rejected SPAD's demand for immediate payment, but asked SPAD's counsel to maintain records of defense costs for possible later reimbursement. Unfortunately, both Reserve and Midland became insolvent and went into liquidation in 1979.

In July 1981, SPAD brought this action against Reserve, Midland and Excess, seeking a declaratory judgment that all three insurers were jointly and severally liable for SPAD's losses in connection with the bond litigation and SEC investigation. SPAD sought a judgment against the insurers for the amount of SPAD's losses, and reimbursement for SPAD's costs and attorney fees in bringing the declaratory judgment action. SPAD moved for summary judgment, and argued that Excess was required to cover the claims Midland and Reserve would normally be liable for if they were not insolvent.

The trial court accepted SPAD's argument, and found all three insurance companies jointly and severally liable for all of SPAD's losses. The court explained its reasoning as follows:

* * * Coverage is provided for all losses, including attorneys' fees and expenses, sustained by plaintiff * * * pursuant to the policy of insurance issued by Reserve Insurance Company * * * Coverage is provided for all of the above losses under that policy of insurance issued by defendants Excess Insurance Company, Ltd. * * *

Coverage is provided for all of the abovementioned losses under that policy of insurance issued by Midland Insurance Company * * *

* * * Both the Midland policy and the Reserve policy are primary policies, applicable to all losses of plaintiff in excess of the deductible therein. To the extent of their liability, these defendants are jointly and severally liable to the plaintiff for all losses.

* * * Reserve and Midland are in liquidation, as this court's file reflects. The policy denominated excess public official liability policy does not require payment under the primary policy in order to effect its coverage. Rather, it simply requires an order adjudicating the liability of the primary policy. The policy provides for payment of all losses of the insured, not merely losses in excess of the amount of the primary policy. Under all of the circumstances, the underwriters under this policy are also jointly and severally liable to the plaintiff for all losses in excess of the retention amount of $2,500 contained in this policy.

1. Malic acid is processed from unripe fruit and is used for flavoring various food products.

The trial court granted judgment for SPAD in the amount of $101,550.26 plus prejudgment interest. In a separate "supplemental" judgment, the trial court ordered Midland and Reserve to reimburse SPAD for its costs and attorney fees in the declaratory judgment action.

Excess argues on appeal that it is only liable for losses in excess of the losses covered under the "primary" insurance policies issued by Midland and Reserve, and that the trial court erred in holding Excess jointly and severally liable with Midland and Reserve for all of SPAD's losses. Midland and Reserve argue that the trial court lacked subject matter jurisdiction to consider the claims against them, that not all of SPAD's alleged losses are covered under their policies, that the trial court improperly computed prejudgment interest, and that the trial court erred in ordering Midland and Reserve to pay SPAD's costs and attorney fees.

### ISSUES

1. Should Excess Insurance be held jointly liable for SPAD's losses?

2. Did the trial court have subject matter jurisdiction to consider SPAD's claims against Midland and Reserve?

3. Are all of SPAD's alleged losses covered by the Midland and Reserve policies?

4. Did the trial court properly compute prejudgment interest?

5. Did the trial court err in ordering Midland and Reserve to pay SPAD's costs and attorney fees?

### ANALYSIS

■ On review of a summary judgment, this court must determine whether there are any genuine issues of material fact and whether the trial court erred in applying the law. *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979). There are no material facts in dispute in this case. The issues presented involve interpretation of insurance policies. The interpretation and construction of an insurance policy is a matter of law which the trial court could properly determine on summary judgment, and which this court may review *de novo* on appeal. *See, e.g., Iowa Kemper Insurance Co. v. Stone*, 269 N.W.2d 885, 887 (Minn.1978).

■ The legal principles governing the interpretation of insurance policies are straightforward. If a policy is unambiguous, the court "must give the language its ordinary meaning and not redraft the contract." *National Farmers Union Property and Casualty Co. v. Anderson*, 372 N.W.2d 71, 74 (Minn.Ct.App.1985) (citing *Simon v. Milwaukee Automobile Mutual Insurance Co.*, 262 Minn. 378, 385, 115 N.W.2d 40, 45 (1962)). If the court concludes that the policy language is ambiguous, the ambiguity must be resolved in favor of the insured. *Columbia Heights Motors, Inc. v. Allstate Insurance Co.*, 275 N.W.2d 32, 36 (Minn.1979).

### I.

Excess argues that the trial court erred in holding it liable for SPAD's losses, because its excess policy unambiguously limits its coverage to losses in excess of $250,000. SPAD, Midland and Reserve argue that the excess policy unambiguously obligates Excess to cover all of SPAD's losses, or, in the alternative, that the policy is ambiguous and must be construed in favor of coverage. SPAD, Midland and Reserve also argue that, for reasons of public policy, Excess should be required to step in and cover SPAD's losses because Midland and Reserve have become insolvent.

All parties agree that Reserve and Midland are "primary" insurers and that Excess is an "excess" insurer. By definition, excess insurers are generally liable only for the amount of loss or damage in excess of coverage provided by other insurance policies. 16 G. Couch, R. Anderson & M. Rhodes, *Couch on Insurance 2d* § 62.48 (1983). However, some jurisdictions have required excess insurers to insure the full amount of loss in cases where primary insurers are insolvent and unable to pay.

In determining whether Excess should be held liable for SPAD's losses, we must determine whether the language of the ex-

cess policy obligates Excess to reimburse SPAD for its losses, and, if not, whether public policy considerations require Excess to cover the amounts that would normally be owed by the insolvent primary insurers.

### A. Interpretation of the Excess Policy

The trial court concluded that the language of the excess policy obligates Excess to cover the full amount of SPAD's losses. The trial court found that the excess policy "provides for payment of all losses of the insured, not merely losses in excess of the amount of the primary policy."

This finding is contradicted by the excess policy's "Declarations," which are incorporated by reference into the body of the policy. The declarations make clear that the policy covers losses of up to $750,000 per occurrence, *"but only in excess of $250,000 each occurrence"* (emphasis in original). The full amount of the loss in question here ($101,550.26) is obviously less than the $250,000 limit.

 SPAD argues that the policy declarations do not control the scope of coverage, because the declarations have no meaning "standing alone," and have only the meaning that the body of the policy gives them. SPAD's attempt to distinguish the declarations from the body of the insurance policy is unpersuasive. It is clear that declarations are a crucial part of an insurance policy, and that interpretation of the declarations is critical to determining the scope of policy coverage. *See, e.g., Farmers Home Mutual Insurance Co. v. Lill,* 332 N.W.2d 635, 637 (Minn.1983). In any event, the declarations are incorporated by reference into the body of the excess policy.

The declarations unambiguously limit Excess' liability to claims in excess of $250,000. Unambiguous provisions of an insurance policy are to be interpreted according to both "plain, ordinary sense" and "what a reasonable person in the position of the insured would have understood the words to mean." *Farmers Home Mutual Insurance Company v. Lill,* 332 N.W.2d at 637 (quoting *Canadian Universal Insurance Co. v. Fire Watch, Inc.,* 258 N.W.

2d 570, 572 (Minn.1977)). There is nothing in the plain language of the declarations, read according to their ordinary meaning, which supports the trial court's finding that Excess Insurance is liable for *all* of SPAD's losses. There is no other language in the excess policy which obligates Excess to cover losses less than $250,000.

The trial court relied on Section II(b) of the excess policy to support the conclusion that Excess is liable for SPAD's losses in this case. That Section provides:

> (b) The Underwriters hereon shall only be liable hereunder for any loss after the Primary Policy has admitted or has been held liable to pay the amounts shown in item C(3) of the Declarations in respect of each occurrence or the amount shown in item C(4) of the Declarations in respect of each policy year as aggregate.

The trial court ruled that actual payment under the primary policy is not required to trigger Excess' liability, so long as the primary insurers have been "held liable" to pay. However, Section II(b) clearly provides that Excess is only liable *after* the primary insurers have been held liable *to pay the amounts shown in item C(3) of the declarations* (i.e. an amount in excess of $250,000). In this case, the primary insurers have not been held liable to pay an amount in excess of $250,000. They have only been held liable to pay $101,550. This liability is insufficient to trigger Excess' liability under the plain language of Section II(b).

The respondents argue that Section II(b) is ambiguous and must be construed against Excess. This argument is unpersuasive. A provision in an insurance policy is ambiguous if it is susceptible of more than one reasonable interpretation. *Farmers Home Mutual Insurance Co. v. Lill,* 332 N.W.2d at 637; *Columbia Heights Motors, Inc. v. Allstate Insurance Co.,* 275 N.W.2d at 34. As discussed above, it is not reasonable to interpret Section II(b) to require Excess to cover losses less than $250,000. It is impossible to get around the fact that Section II(b) specifically refers to Declaration C(3), which limits the

policy coverage to amounts in excess of $250,000 per occurrence. None of the parties has suggested any other reasonable interpretation for Section II(b). Since Section II(b) is not susceptible of more than one reasonable interpretation, it is not ambiguous, and there is no basis for interpreting the section against its clear language and in favor of coverage.

### B. *Public Policy Considerations*

Since the clear language of the excess policy does not obligate Excess to pay for losses less than $250,000, the only way that Excess can be held liable for all of SPAD's losses is if this court holds, as a matter of public policy, that an excess insurer must cover the full loss in cases where the primary insurers are insolvent. Minnesota courts sometimes consider questions of public policy in interpreting insurance policies. *See, e.g., Atwater Creamery Co. v. Western National Mutual Insurance Co.,* 366 N.W.2d 271 (Minn.1985); *Perl v. St. Paul Fire & Marine Insurance Co.,* 345 N.W.2d 209 (Minn.1984). However, we see no compelling public policy reasons for holding Excess liable for SPAD's losses in this case.

Minnesota courts generally interpret insurance policies liberally to effectuate the "reasonable expectations" of the insured. This rule is usually applied to protect individuals in cases where the terms of an insurance policy have been misrepresented or misunderstood, or where legal technicalities would defeat coverage which the insured could reasonably believe was in place. *See Atwater Creamery Co. v. Western National Mutual Insurance Co.,* 366 N.W.2d at 276–277. There is no reason to apply the "reasonable expectations" doctrine in this case. Nothing in the language of the excess policy would reasonably lead SPAD to expect that Excess would be liable for all of SPAD's losses in the event that the primary insurers became insolvent.

There is also nothing in the language of the policy to show that the parties bargained for Excess to cover all losses in the event that the primary insurers became insolvent. In cases from other jurisdictions where an excess insurer was required to "drop down" and cover losses that should have been paid by an insolvent primary insurer, the result was based on the language of the excess policy, not general considerations of public policy. *See, e.g., Massachusetts Insurers Insolvency Fund v. Continental Casualty Co.,* 309 Mass. 598, 601, 506 N.E.2d 118, 121 (1987) ("[A]n excess policy that says without limitation that it drops down when the underlying coverage is reduced provides first dollar coverage when the primary insurer becomes insolvent and unable to make any payment on a claim"); *Werner Industries, Inc. v. First State Insurance Co.,* 217 N.J. Super 436, 438–39, 526 A.2d 236, 237 (App. Div.1987), *cert. granted,* 108 N.J. 585, 531 A.2d 1357 (1987) (excess policy provided coverage of losses in excess of "amounts recoverable" under primary policy); *Gladstone v. D.W. Ritter Co.,* 133 Misc.2d 922, 927, 508 N.Y.S.2d 880, 883 (1986) (policy was "excess over any other collectible insurance"); *Reserve Insurance Co. v. Pisciotta,* 30 Cal.3d 800, 812, 180 Cal.Rptr. 628, 634, 640 P.2d 764, 770 (1982) (en banc) (policy covered losses in excess over "amounts recoverable" under primary policy or as alternative to losses "not covered" by primary policy). None of these cases support the imposition of "drop down" liability where there is nothing in the language of the excess policy to indicate that the parties intended, or might reasonably have expected, such a result.

Numerous other jurisdictions have declined to require excess insurers to provide "drop down" coverage in the absence of an express agreement to do so, because of the established customs and practices of the insurance industry:

The excess insurer's risk of loss is based on the assumption that a predetermined amount of primary coverage will be exhausted before the excess insurer must pay. Imposing primary coverage on the excess insurer would "transmogrify the excess policy into one guaranteeing the solvency of whatever primary insurer the insured might choose." Excess insurers are not required to scrutinize primary insurers financial stability before issuing

policies or to guarantee that the insured's choice of primary carriers will always be sound.

*Steve D. Thompson Trucking, Inc. v. Twin City Fire Insurance Co.*, 832 F.2d 309, 311 (5th Cir.1987) (quoting *Continental Marble and Granite v. Canal Insurance Co.*, 785 F.2d 1258 (5th Cir.1986)); *see also Zurich Insurance Co. v. Heil Co.*, 815 F.2d 1122 (7th Cir.1987); *Mission National Insurance Co. v. Duke Transportation Company, Inc.*, 792 F.2d 550 (5th Cir.1986); *Garmany v. Mission Insurance Co.*, 785 F.2d 941 (11th Cir.1986); *Radiator Specialty Co. v. First State Insurance Co.*, 651 F.Supp. 439 (W.D.N.C.1987), *aff'd.*, 836 F.2d 193 (4th Cir.1987); *Guaranty National Insurance Co. v. Bayside Resort, Inc.*, 635 F.Supp. 1456 (D.V.I.1986). We find these considerations persuasive.

■ It is also important to note that SPAD may still be able to collect for its losses even if Excess is not required to pay them. The Minnesota Insurance Guaranty Corporation (MIGA) may be obligated by statute to pay the amounts which the insolvent primary insurers owe SPAD.[2] *See* Minn.Stat. § 60C (1986).

For all of these reasons, Minn.Stat. §§ 60C.01–.20 (1986), we decline to hold Excess liable for SPAD's losses on public policy grounds when the clear language of the excess insurance policy provides no basis for "drop down" coverage. We therefore reverse the portion of the judgment holding Excess jointly liable for SPAD's losses.

## II.

■ Midland and Reserve argue that the trial court lacked subject matter jurisdiction to consider SPAD's claims against them, because Midland and Reserve are the subject of receivership orders in Illinois and New York which enjoin assertion of further claims against them. This argument fails under *Fuhrman v. United America Insurors*, 269 N.W.2d 842 (Minn. 1978). In *Fuhrman*, the plaintiffs sued an insolvent Iowa insurance company in Minnesota state district court. The Iowa insurance company was in receivership in Iowa, and an Iowa state court had issued an injunction restraining claimants or policy holders "from commencing actions or proceeding further in the Courts to enforce their claims." 269 N.W.2d at 846. The Minnesota Supreme Court held that the Iowa injunction purporting to enjoin claimants from proceeding against the insolvent company did not affect the subject matter jurisdiction of the Minnesota district court or bar the court from considering an action against the insolvent Iowa insurer. 269 N.W.2d at 848.

The circumstances presented in this case are identical to those in *Fuhrman*. Midland and Reserve are the subject of receivership orders issued by courts in other states which purport to enjoin policy holders or claimants from bringing further claims against the insolvent insurers. It is clear under *Fuhrman* that these injunctions do not deprive the Minnesota courts of subject matter jurisdiction to consider SPAD's claims against Midland and Reserve.

## III.

Midland and Reserve also argue that some of SPAD's losses are not covered by their primary liability insurance policies. They argue that some of the attorney fees for which SPAD seeks reimbursement were spent defending actions which were outside the scope of coverage, and that they should not be held liable for fees incurred before January 25, 1977, the date when SPAD first notified them of the pending bond lawsuits.

### A. *Scope of Primary Policies*

When the company leasing the malic acid plant financed by SPAD defaulted on its lease, SPAD took over the property and was forced to defend a number of mechanics lien actions. Reserve and Midland al-

---

**2.** Excess argues that the trial court should have ordered MIGA to pay the amounts owing to SPAD. However, since MIGA was not a party to the declaratory judgment action, the trial court had no jurisdiction for doing so.

lege that $14,509.50 of the fees SPAD seeks are attributable to the lien actions.

Midland and Reserve also argue that they should not be liable for the $20,000 SPAD paid in settlement of a class action in St. Louis county court. Midland and Reserve contend that this action was an "accounting" action to determine the amount of funds held by the bond trustee and their proper distribution to the bondholders, and that the case did not involve any claims for compensatory damages against SPAD.

Midland and Reserve argue that both the mechanics lien actions and the accounting action arose out of the normal course of SPAD's business, not out of claims against SPAD for alleged "wrongful acts," and that SPAD's claims for its legal costs in those actions are therefore not covered under the primary public officials liability policies. These issues were presented to the trial court, and the trial court apparently awarded judgment for SPAD on both claims, but did not discuss its reasons for concluding that the claims were covered under the primary policies.

Both the Midland and Reserve policies cover SPAD's losses resulting from claims against SPAD for "wrongful acts." "Wrongful acts" are defined as "any actual or alleged error or misstatement or act or omission or neglect or breach of duty * * *."

■ The complaint in the class action alleges that SPAD wrongfully failed to notify the bondholders of cost overruns during construction of the malic acid plant. The complaint seeks an accounting and an order requiring SPAD to pay the bondholders for any losses resulting from SPAD's alleged breach of trust. This action clearly arises from alleged "wrongful acts" by SPAD, and thus falls within the coverage of the primary policies.

■ However, we agree with Midland and Reserve that the expenses SPAD incurred in defending the mechanics lien actions are not covered by the primary policy. We fail to see how the mechanics lien actions arose from "wrongful acts" commit-

ted by SPAD. However, it appears from affidavits submitted to the trial court that SPAD's expenses in defending the mechanics lien actions may have been included in the judgment. We reverse any portion of the judgment that requires Midland and Reserve to reimburse SPAD's mechanics lien expenses, and remand so that the trial court can recompute SPAD's damages accordingly.

### B. *Notice of Claims*

■ Midland and Reserve also argue that they are not liable for SPAD's litigation costs which accrued before SPAD formally notified the insurers of the pending bond litigation. Both the Midland and the Reserve policy require SPAD to give notice of claims "as soon as practicable." The Midland policy also provides that notice of claims must be given within a year.

Even assuming that SPAD did not notify Reserve and Midland of its claims "as soon as practicable," this failure cannot defeat the insurers' liability for SPAD's claims unless the insurers show that they suffered "actual prejudice" because of the delayed notification. *See Reliance Insurance Co. v. St. Paul Insurance Companies,* 307 Minn. 338, 341, 239 N.W.2d 922, 925 (1976). Midland and Reserve have not alleged that they were prejudiced by SPAD's alleged late notice, and no prejudice is apparent from the record. Under these circumstances, the alleged late notice does not defeat the insurer's liability to pay all covered claims, including those that accrued before notice was received.

### IV.

Midland and Reserve also argue that the trial court improperly computed prejudgment interest. They argue that SPAD is not entitled to prejudgment interest on claims that accrued before enactment of certain amendments to the prejudgment interest statute, Minn.Stat. § 549.09, and that all but $20,000 of SPAD's claims are exempt from prejudgment interest under the statute.

The first of these arguments is based on a 1984 amendment to Section 549.09, which

provided that prejudgment interest would begin to accrue on July 1, 1984 on any causes of action pending as of the time of the amendment. Midland and Reserve contend that, since this declaratory judgment action was pending at the time of the 1984 amendment, SPAD is only entitled to prejudgment interest from July 1, 1984.

 This argument assumes that SPAD is entitled to prejudgment interest only under the terms of Section 549.09 as amended in 1984. Section 549.09 provides for prejudgment interest and limits on prejudgment interest "except as otherwise provided by contract or allowed by law." Minn.Stat. § 549.09, subd. 1(b) (1986). The prejudgment interest statute was not intended to disturb the existing law of prejudgment interest, but to provide for prejudgment interest in situations where prejudgment interest was not already allowed by law. It was settled law before the 1984 amendments to Section 549.09 that where defense costs are awarded against an insurer, prejudgment interest must be paid from the time the bills for the defense costs were first submitted to the insurer for payment. *Jostens, Inc. v. CNA Insurance, Continental Casualty Company,* 336 N.W.2d 544, 546 (Minn.1983). The trial court properly computed prejudgment interest according to this formula.

 Midland and Reserve also rely on Minn.Stat. § 549.09, subd. 1(b)(6), which provides that "preverdict or prereport interest shall not be awarded" on "that portion of any verdict or report which is founded upon interest, or costs, disbursements, attorney fees, or other similar items *added by the court*" (emphasis added). They argue that all but $20,000 of SPAD's claims (the amount paid in settlement of one lawsuit) are costs, disbursements and attorney fees incurred in defense of the bond claims, and are thus not subject to prejudgment interest under Minn.Stat. § 549.09, subd. 1(b)(6).

Midland and Reserve misconstrue the nature of the judgment in this case. It is clear that Minn.Stat. § 549.09, subd. 1(b)(6) applies only to costs and attorney fees *added* to a judgment by a court. The judg-

ment in this case is for compensatory damages for the insurers' breach of insurance policies. It is true that the judgment is intended to reimburse SPAD for costs and attorney fees spent in connection with other actions. However, the costs and fees for which SPAD is reimbursed have not been "added by the court" to this judgment, they are the subject matter of the judgment itself. It was proper for the trial court to award prejudgment interest on the judgment.

### V.

The trial court ordered Midland and Reserve to reimburse SPAD for its costs and attorney fees in bringing this declaratory judgment action. Midland and Reserve appeal the fee award. SPAD argues that Excess should have been held liable for the costs and fees along with the other insurers.

 Attorney fees may be awarded when an insured prevails in a declaratory judgment action to determine the scope of insurance coverage, because insurance contracts are intended to "relieve the insured of the financial burden of litigation" and because the costs of the declaratory judgment action are considered to be "consequential damages" flowing from the breach of the insurance contract. *Kline v. Hanover Insurance Co.,* 368 N.W.2d 381, 383 (Minn.Ct.App.1985) (quoting *Lanoue v. Fireman's Fund American Insurance Companies,* 278 N.W.2d 49, 55 (Minn. 1979)); *see also Brown v. State Automobile & Casualty Underwriters,* 293 N.W.2d 822, 825 (Minn.1980). The trial court awarded fees against Midland and Reserve, but not against Excess, because the court concluded that Excess had a good faith basis for challenging its liability for SPAD's losses. There is no apparent error in the trial court's decision. SPAD is entitled to fees from the insurers liable for its losses. There is no basis for ordering Excess to pay SPAD's attorney fees in bringing the declaratory judgment action, because Excess is not liable for SPAD's claims.

## DECISION

The part of the judgment holding Excess jointly liable for SPAD's losses is reversed. The part of the judgment holding Midland and Reserve liable for expenses SPAD incurred in defending mechanics lien actions is reversed, and the judgment is remanded for recomputation. The remainder of the judgment is affirmed.

Affirmed in part, reversed in part and remanded.