**NORTHWEST AIRLINES, INC., Appellee,**

v.

**FLIGHT TRAILS; S 580S Aircraft Co.; Air Resorts, also known as Air Resorts Airline; and Theodore L. Vallas, Appellants.**

Nos. 92–2325, 92–3971.

United States Court of Appeals, Eighth Circuit.

Submitted May 10, 1993.

Decided Aug. 27, 1993.

Paula Rotenberg, of San Diego, CA, argued (Robert A. Linn and Carrie L. Gleeson, on the brief), for appellants.

Craig David Diviney, Minneapolis, MN, argued (James K. Langdon II, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, LAY, Senior Circuit Judge, and FAGG, Circuit Judge.

RICHARD S. ARNOLD, Chief Judge.

These appeals arise from a breach-of-contract action between the appellants—Flight Trails, S 580S Aircraft Co., Air Resorts, and Theodore Vallas—and Northwest Airlines (NWA).[1] Air Resorts is not appealing the District Court's[2] determination that it broke the contract, only its calculation of damages. It also appeals the amount of attorneys' fees

---

1. Flight Trails and S 580S Aircraft Co. are wholly owned by Vallas and are doing business under the name of Air Resorts. For convenience, when referring to the appellants collectively, we will use the name Air Resorts.

2. The Hon. James M. Rosenbaum, United States District Judge for the District of Minnesota.

awarded. We affirm, but remand for an offset in favor of Air Resorts.

## I.

In two separate purchase agreements entered into in September 1988, Flight Trails and S 580S Aircraft agreed to purchase from NWA thirteen used CV–580 aircraft and the spare-parts inventory for those aircraft for $15 million, with a $300,000 deposit. The agreement between NWA and Flight Trails provided that NWA would deliver five aircraft and 50% of the spare parts to Flight Trails on December 8, 1988, in exchange for a $100,000 pre-delivery deposit and $6 million to be paid upon delivery. The agreement between NWA and S 580S Aircraft provided that NWA would deliver three aircraft and certain spare parts on October 7, 1988, and five aircraft and the remainder of the spare parts on March 8, 1989. S 580S Aircraft was to pay a pre-delivery deposit of $200,000, $3 million upon delivery of the first three aircraft, and $6 million upon delivery of the remaining five aircraft and parts. Vallas personally guaranteed the performances of his two companies.

Vallas paid the $300,000 deposit in September, and on October 7, 1988, S 580S Aircraft accepted the first three aircraft and paid NWA $3 million. Thereafter, however, the relationship between the parties began to sour. The parties first disputed whether NWA had delivered the proper number of spare engines and other spare parts. Also, the agreements did not identify exactly which spare parts were to be delivered in December and which were to be delivered in March, and the parties were unable during November and December to agree upon the proper split. Flight Trails refused to make payment for or take delivery of the five aircraft and spare parts in December or in March.

In March of 1989, NWA sued Air Resorts, seeking damages for breach of contract, breach of the guarantee by Vallas, and conversion. Air Resorts counterclaimed for fraudulent and negligent misrepresentation and breach of contract, seeking specific performance. After a six-day bench trial in December 1991, the District Court found that the contracts were enforceable, that Air Resorts was in breach of the contracts, that the deficiencies in NWA's performance were insufficient to excuse Air Resorts from performing, that NWA was not limited to the $300,000 deposit as liquidated damages, and that NWA was entitled to additional damages. After the parties submitted briefs as to the appropriate amount of damages, the Court entered judgment against Air Resorts in the amount of $7,635,086.10 plus prejudgment interest, and awarded attorneys' fees in the amount of $645,137.20. Air Resorts appeals.

## II.

■ Air Resorts first argues that the District Court erred in refusing to limit NWA's damages to $300,000 as agreed by the parties in the liquidated-damages clause. Section 2.01 of the Flight Trails agreement pertaining to the December 8, 1988, delivery states that the deposit was "non-refundable except on the following terms: that one hundred thousand dollars ($100,000) be credited to Purchaser upon closing of the Aircraft." Appellants' Addendum 4. Section 2.01 of the S 580S agreement pertaining to the March 1989 delivery provides that the deposits were "non-refundable except on the following terms: that fifty thousand dollars ($50,000) be credited to Purchaser upon closing of the fourth (4th) Aircraft; the remaining one hundred and fifty thousand dollars ($150,000) will be credited upon the closing of the last Aircraft." Appellants' Addendum 5. The liquidated-damages clause, provision 9.01, contained in both agreements, states as follows:

> 9.01 *Default.* ... If the Purchaser refuses to purchase the Aircraft and Spares upon the terms and conditions set forth herein, or if any affiliate of Purchaser fails to perform its obligations under written agreement with Seller, the Seller shall be entitled to either (a) such remedies as may be available in law or equity, or (b) if Purchaser does not accept the Aircraft and Spares, retain the deposit as liquidated damages (not as a penalty) for such failure.

Air Resorts argues that these provisions together limit NWA to retaining the $300,000

deposit as liquidated damages upon nonacceptance by Air Resorts any time before the delivery and acceptance of the December aircraft. Liquidated damages is the exclusive remedy, according to this argument. In our view, though, section 9.01 clearly allows NWA alternative remedies in this situation. In case of a breach of the contract by Air Resorts, the section specifically allows NWA either such remedies as are available in law or equity or, if the breach is failure to accept the aircraft, retention of the deposits as liquidated damages. In other words, 9.01(a) applies to any breach, including nonacceptance, and 9.01(b) applies only if the breach is nonacceptance. Since the breach here was nonacceptance, NWA was free to choose either remedy. It chose to sue for compensatory damages. Therefore, NWA is entitled to remedy (a), and any damages award should take into account the fact that Air Resorts has already paid $300,000 to NWA.

### III.

In the alternative, Air Resorts argues that the District Court calculated the damages incorrectly. The District Court held that the appropriate measure of damages was set forth in Minn.Stat.Ann. § 336.2–708(1) (1966) (identical to Uniform Commercial Code § 2–708(1)). Section 336.2–708(1) provides: ·

> Subject to subsection (2) and to the provisions of this article with respect to proof of market price (section 336.2–723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages ... but less expenses saved in consequence of the buyer's breach.

The Court then rejected both parties' evidence of market price, and, quoting Minn. Stat.Ann. § 336.2–723(2) (1966),[3] stated that "[i]n view of the limited and declining market for the goods in question, the Court finds that a reasonable substitute for the market price is $4.25 million." Appellants' Appendix

114. The Court went on to subtract that amount from the unpaid $12 million contract price, add incidental damages stipulated by the parties, and set off an amount for certain deficiencies in NWA's delivery of the three planes in October of 1988. Air Resorts argues that the Court failed to use the proper market value, failed to deduct expenses saved by NWA as a result of the breach, and failed to offset the damages by the amount supported by the evidence.

Section 336.2–708(1) specifically requires a Court to use the market value at the "time and place for tender," that is, at the time of delivery. In this case, that time is between December of 1988 and March of 1989. If there is no evidence of market price at that time and place, then the Court may receive evidence of the prevailing price in comparable markets "within any reasonable time before or after the time described" to establish the market price. Minn.Stat.Ann. § 336.2–723(2), *supra.* The Court may not, however, reject legitimate evidence of the market price at the time and place for tender and substitute a price which is not supported by the evidence. Air Resorts argues that the Court did that here by using the $4.25 million price, when the evidence proved a relevant market price of $10 million.

Air Resorts presented at trial the following evidence of the relevant market price. In the spring of 1989, NWA began negotiating with Ronald Monesson for the sale of the remaining ten aircraft and spare parts. NWA first offered the package for $13.5 million. After more negotiation, on June 20, 1989, NWA and Monesson–Furdal Joint Venture executed a letter of intent, incorporating the terms of the contract later entered into on July 13, 1989, in which Monesson was to pay $10 million for the aircraft and parts. (Monesson also agreed to pay the broker $500,000.) The contract required Monesson to post a letter of credit within two weeks, which time was extended several times by NWA when Monesson ran into trouble getting financing. Monesson testified that the

3. This section states that "[i]f evidence of a price prevailing at the times or places described in this article is not readily available the price prevailing within any reasonable time before or after the time described or at any other place which in commercial judgment or under usage of trade would serve as a reasonable substitute for the one described may be used...."

litigation between Air Resorts and NWA disturbed the potential lenders, since there might be a problem concerning title to the aircraft if Air Resorts prevailed in its counterclaim for specific performance. Monesson Deposition 29, 31–34. Monesson testified that in order for the deal to proceed, he asked for—and obtained an oral assurance from NWA that he would receive—an opinion letter from outside counsel and an indemnification agreement for $10 million. *Id.* at 36. When the time came to put it in writing, however, NWA failed to comply. Instead, NWA provided an opinion letter from its own in-house counsel and a general indemnification agreement which Monesson would not accept. *Ibid.* In addition, Air Resorts was asked to relinquish its specific-performance claim, an action that would have assured Monesson of obtaining title to the assets free of any equity in favor of Air Resorts. This request was refused. *Id.* at 63, 66–67, 70. For these reasons, the deal fell through, and the $10 million contract was never executed. *Id.* at 53.

NWA, on the other hand, argued that the best evidence of market price was a $4 million offer by prospective buyers two years after the original tender was to take place. In addition, evidence at trial indicated that by late 1989, the market conditions for the aircraft had begun to decline. This was attributed to an over-availability of Convair 580 aircraft, the crash of a 580 in Norway, and increased availability of similar used aircraft such as the 737–100 and DC–9. At the time of trial, December 1991, NWA was asking $5.6 million for the fleet and parts, as is, where is. The District Court took all of this into account when concluding that $4.25 million was a fair price.

The issue is well argued on both sides. Each position has some support in the record. The crucial question is whether the Monesson contract should be taken as fixing market value. Unfortunately, the contract never became final. Each party blames the other for this state of affairs. NWA could have cleared away any obstacles by indemnifying Monesson against Air Resorts' claim to

the specific assets. Air Resorts could have done the same by relinquishing its claim. It seems to us that both NWA and Air Resorts acted unreasonably. Either of them could have removed the impediment to the execution of the Monesson contract without giving up much of substance. There was not much chance that a claim to specific performance of a contract to sell assets like those involved here—assets evidently not at all unique, as Blackacre would be—could succeed. On the whole, we are not convinced that the District Court's rejection of the Monesson contract as the measure of market value at or near the time and place for tender was based on any clearly erroneous finding of fact, or influenced by any error of law. Our conclusion in this respect is fortified by the fact that the District Court's determination resolves substantial uncertainty as to damages against the party—Air Resorts—that broke its contract. The District Court's finding of $4.25 million, though without direct support in the record, is not clearly erroneous.

■ Air Resorts next argues that the District Court erred in not reducing the damage award by the expenses NWA saved as a result of the breach. We agree, at least in part. The contract between NWA and Air Resorts included new wide-body interior kits for each aircraft.[4] The ten remaining aircraft do not include new interior kits. Negotiations for the sale of the aircraft, including the NWA–Monesson contract, were for the aircraft without the new wide-body interiors. Thus, the market value found by the District Court failed to take into account the cost of the missing interiors, which interiors were a part of the NWA–Air Resorts contract. Since NWA never had to supply the interiors, it saved this expense as a result of the breach. Using the cost determined by the District Court for ten kits, we find the award of damages should be reduced by $954,970.

Finally, Air Resorts claims that the Court erred in calculating the setoff amount for deficiencies in NWA's October 1988 delivery. Specifically, Air Resorts asserts that the evidence proved that the cost to replace the galleys missing from the three planes ex-

---

4. The District Court did reduce the damage award by the cost of three interior kits, since the

three aircraft actually delivered to and paid for by Air Resorts in October did not include them.

ceeded the $9,000 awarded by the Court. Our review of the record on the issue has failed to convince us that the Court's finding was clearly erroneous.

## IV.

■ Air Resorts next argues that NWA's inability to perform on December 8, 1988, was a failure of consideration, excusing Air Resorts' duty to perform. Air Resorts first claims that the parts NWA was to ship on December 8 had not even been collected for shipment. Secondly, even assuming it was proper to split the parts by value, which Air Resorts disputes, the parts NWA planned to ship were not CV–580 parts at all, but CV–440 and CV–340 parts; and the interior kits and seats counted by NWA as spare parts were not spare parts at all. Air Resorts was already entitled to these as integral parts of the aircraft. These circumstances, Air Resorts argues, particularly in light of the significant deficiencies in NWA's October delivery, were a material failure of consideration, excusing Air Resorts' duty to perform.

The District Court found that these problems were simply normal commercial problems that arise in any complex transaction, and that they likely would have been worked out by a financial setoff one way or the other between the parties. The Court held that NWA's failures did not amount to a material breach. We agree and affirm the Court's conclusion on this issue.

## V.

Finally, in a separate appeal, Air Resorts claims that the District Court abused its discretion in awarding excessive attorneys' fees and costs, and that the Court erred in determining the time for which prejudgment interest is due. We reject Air Resorts' arguments and affirm the judgment of the District Court.

■ Generally, absent a statute mandating otherwise, each party to a lawsuit is responsible for his or her own attorney's fees. In this case, however, the parties contractually agreed that "[i]f Seller or Purchaser pursues any remedy to which it is entitled pursuant to this Section 9.01, the prevailing party shall be entitled to all reasonable costs and expenses incurred thereby, including attorneys' fees." Appellants' Addendum 5. Air Resorts first argues that since it received significant setoffs, it was the "prevailing party" for that percentage of the damage award. We disagree. "Prevailing party" means the winner of the lawsuit. The winner is NWA. Secondly, Air Resorts argues that the $597,-498.95 award is clearly excessive, and it cites numerous instances of overbilling by NWA's attorneys. We have reviewed the record, and are not persuaded that the District Court abused its discretion in awarding what it did. We also reject Air Resorts' contention that the Court abused its discretion in awarding the costs requested by NWA.

■ Finally, Air Resorts claims that the District Court erred in its award of prejudgment interest. Since state law provides the rule of decision in this case, the award of prejudgment interest is governed by state law. *California & Hawaiian Sugar Co. v. Kansas City Terminal Warehouse Co.*, 788 F.2d 1331, 1333 (8th Cir.1986). The District Court used Minn.Stat. § 334.01 in determining the interest rate to use and awarded interest from the time of the breach, December 8, 1988, to February 20, 1992, the date of the District Court's order entering judgment against Air Resorts. Air Resorts argues that the District Court should have used Minn.Stat. § 549.09, under which prejudgment interest runs only from the beginning of the judicial proceeding. Air Resorts claims that § 334.01 applies only to judgments before July 1, 1984, since that is when the amendment to § 549.09 became effective. We disagree with Air Resorts' claim that § 549.01 was intended to supersede § 334.01.

■ The law in Minnesota has always been that prejudgment interest is allowed in the case of unliquidated claims "where the damages [are] readily ascertainable by computation or reference to generally recognized standards such as market value...." *Potter v. Hartzell Propeller, Inc.*, 291 Minn. 513, 189 N.W.2d 499, 504 (1971). The Minnesota Court of Appeals made it clear in *Seaway Port Authority v. Midland Ins. Co.*, 430 N.W.2d 242, 252 (Minn.App.1988), that § 549.09 was not intended to disturb the existing law of prejudgment interest. It was

solely to allow interest in situations where interest was not already allowed by law. In this case, the Court found that prejudgment interest was already allowed by law, since the damages were "readily ascertainable" from the date of the breach on December 8, 1988. Since we do not think that finding is clearly erroneous, we affirm the Court's determination regarding the appropriate calculation of prejudgment interest.

## VI.

In conclusion, we affirm the District Court's determination of damages, with one exception. The award should be reduced by $954,970 to account for the cost of ten new interior kits NWA did not have to purchase as a result of the breach. The proper award is, therefore, $6,680,116.10.[5] We affirm the Court's award of attorneys' fees and costs. We also affirm the Court's determination that the personal guarantees of Mr. Vallas are fully enforceable. Finally, we remand to the Court for entry of judgment and the calculation of prejudgment interest in accord with this opinion.

It is so ordered.

---

**5.** It is unclear from the District Court's judgment whether the amount awarded took into account the $300,000 that Air Resorts has already paid to NWA. If not, the Court should reduce the award by $300,000.