CINCINNATI INSURANCE COMPANY, Appellant,

v.

Francine FRANCK, et al., Respondents,

John Penniston, et al., Respondents.

No. C4–01–1666.

Court of Appeals of Minnesota.

May 14, 2002.

Peter C. Sandberg, Kari C. Stonelake–Hopkins, Dunlap & Seeger, P.A., Rochester, for appellant.

Paul R. Dahlberg, Meshbesher & Spence, Ltd., Rochester, for respondents Franck.

Scott R. Suter, Sawicki & Phelps, P.A., Woodbury, for respondents Penniston and AMICA Mutual Insurance Co.

Considered and decided by GORDON W. SHUMAKER, Presiding Judge, PARKER, Judge*, and, HUSPENI, Judge*.

## O P I N I O N

HUSPENI, Judge.

Appellant challenges the determination of the district court that an insured under both a primary and an umbrella liability insurance policy could reach the umbrella coverage even though he settled for less than the limits of the primary policy. Because the district court's decision is consistent with public policy considerations expressed in Minnesota caselaw, we affirm.

## FACTS

Respondent Joyce Penniston was driving a car owned by her husband, respondent Dr. John Penniston, when she struck and seriously injured respondent Francine Franck.

AMICA Mutual Insurance Company provided primary liability insurance for the Pennistons, with a bodily injury limit of $500,000. Dr. Penniston also carried additional insurance under a "personal umbrella liability policy" written by appellant Cincinnati Insurance Company. This policy had bodily injury limits of $3 million, but payments would be made only "over and above the amounts provided for in the basic policies."

Franck and her husband entered a settlement agreement and release with the Pennistons and AMICA for $425,000. The agreement provided that the payment was in partial satisfaction of any claim the Francks may have against the Pennistons to the extent of the first $500,000, but that the Pennistons would have no personal liability in excess of $425,000. The Francks also released AMICA, agreeing that $500,000 would be credited against any judgment in the Francks' favor, and reserved claims against the Pennistons up to Cincinnati's limits. The agreement also provided that the settlement would be governed by *Drake v. Ryan*, 514 N.W.2d 785 (Minn.1994).

The Francks then sued the Pennistons. AMICA accepted Cincinnati's tender of the defense of the action. Later, Cincinnati exercised its option to assume the defense of the lawsuit, and then brought this declaratory judgment action seeking the district court's declaration that there was no coverage under the umbrella policy because AMICA had not paid the limit of its primary policy.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

After hearing cross-motions for summary judgment, the district court granted summary judgment to the Francks, ruling that Cincinnati's umbrella insurance policy provided bodily injury coverage. The court found it significant that the Cincinnati policy does not contain any language that requires the primary policy limits to be exhausted before coverage under the umbrella policy is available. The court rejected Cincinnati's argument that the primary policy had to be exhausted, and concluded that, in any event, the settlement reached by the parties exhausted the primary policy limit.

Contending that the district court erred in its interpretation of the umbrella insurance policy, Cincinnati appeals.

## ISSUE

Did the district court err by ruling that a settlement for less than the limits of a primary liability insurance policy nevertheless triggered excess coverage under an umbrella policy that stated that it would provide coverage only over and above that provided in the primary policy?

## ANALYSIS

On review of summary judgment, this court must determine whether there exists any genuine issue of material fact for trial and whether the district court erred in applying the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). There are no facts in dispute; thus we must independently review the district court's interpretation of the insurance contract and application of the law. *Nat'l City Bank v. St. Paul Fire & Marine Ins. Co.*, 447 N.W.2d 171, 175 (Minn.1989). The interpretation and construction of an insurance policy is a question of law that this court reviews de novo. *State Farm Ins. Cos. v. Seefeld*, 481 N.W.2d 62, 64 (Minn.1992).

Cincinnati agreed, through its insurance policy, to provide "[e]xcess insurance over and above the amounts provided for in basic policies * * *." It is undisputed that the "basic policy" applicable here is AMICA's primary liability policy with a $500,000 bodily injury limit.

Cincinnati's policy requires the insured to maintain basic coverage of $500,000, and provides: "We will pay only the amount which is more than the required basic policy limits and more than any other collectible insurance." If there is other insurance in addition to the basic policy, Cincinnati provides that "the other insurance will pay first and this policy will be in excess of the other insurance."

In deciding insurance coverage questions, we must begin with a review of the insurance policy at issue because insurance policies, like other contracts, "are matters of agreement by the parties and the function of a court is to determine what the agreement was and enforce it." *Fillmore v. Iowa Nat'l Mut. Ins. Co.*, 344 N.W.2d 875, 877 (Minn.App.1984). In ascertaining what the agreement was, we must construe the policy according to the terms the parties have used, and we must give the policy language its ordinary and usual meaning so as to give effect to the parties' intent as it appears from the contract. *Dairyland Ins. Co. v. Implement Dealers Ins. Co.*, 294 Minn. 236, 244–45, 199 N.W.2d 806, 811 (1972). Where there is no ambiguity in an insurance policy, there is no room for construction. *Id.* at 244, 199 N.W.2d at 811.

It is not disputed that Cincinnati's policy is an "umbrella" policy that provides "excess" insurance coverage. The nature and the legal and practical significance of an umbrella excess insurance policy are well-known, as the Minnesota Supreme Court has explained:

An umbrella policy, typically, requires the insured to carry underlying liability insurance up to a certain limit with a different insurance company. The umbrella insurer then provides an "umbrella" over this underlying coverage by agreeing to pay that part of any claim against the insured that exceeds the limits of the underlying coverage up to the limits of the umbrella. This arrangement enables the umbrella insurer to offer high limits at a relatively modest premium. The umbrella policy is attractive to the prudent person who wants protection for the infrequent but always possible and much-to-be-dreaded catastrophic loss. The policy can be issued for a relatively modest premium because most claims are absorbed by the underlying insurer, and also because the umbrella insurer's defense costs are ordinarily less than those of other insurers. The cost of defense is no small item. Indeed, in this case defense costs far exceeded the amount paid to settle the claim.

*Jostens, Inc. v. Mission Ins. Co.*, 387 N.W.2d 161, 165 (Minn.1986) (citation omitted).

Umbrella insurers are generally liable only for the amount of loss or damage in excess of coverage provided by the primary policy. *Seaway Port Auth. v. Midland Ins. Co.*, 430 N.W.2d 242, 247 (Minn. App.1988) (citing 16 George J. Couch et al., *Couch on Insurance* § 62.48 (2d ed. 1983)).

■ The plain and ordinary meaning of "excess" is that it is over and above some other quantity. *See The American Heritage Dictionary of the English Language* 638 (3d ed. 1992) (stating excess is "[t]he amount or degree by which one quantity exceeds another"). Applying the language

of Cincinnati's policy in its ordinary sense, the excess coverage is "over and above the amounts provided" in the AMICA policy. Although respondents argue that the absence of an exhaustion clause in the Cincinnati policy is relevant, we need not address that issue. We conclude, instead, that respondents raise a stronger, and ultimately determinative issue.

The district court noted in its thorough and lucid memorandum that to hold that Cincinnati had no duty to defend or indemnify would "nullify the intent of the settlement" or would void the settlement and "deprive the Pennistons of the protection from personal exposure that they bargained for in the agreement." Thus, the critical question on appeal is: Did the district court correctly assess the effect of the settlement agreement on the availability of umbrella coverage? We conclude that the answer to that question is "Yes."

We note initially that there is little merit to Cincinnati's argument that the settlement requires Cincinnati to "drop down" and provide coverage at lower limits, thus forcing an increase in premiums for umbrella policies. Cincinnati's duty to indemnify will be only for amounts over and above the primary policy limit. The duty to defend has already been assumed, and Cincinnati is not seeking to recover the costs of defense.

Caselaw is informative in deciding how a settlement agreement affects the question of when umbrella coverage is available. In *Drake v. Ryan*, 514 N.W.2d 785 (Minn. 1994), the Minnesota Supreme Court adopted the rationale of the Wisconsin Supreme Court in *Loy v. Bunderson*, 107 Wis.2d 400, 320 N.W.2d 175 (1982), and approved a settlement under which the plaintiff could reserve a claim against defendant's excess[1] liability carrier for dam-

---

1. In *Drake*, both policies actually paid claims

from "dollar-one." The policy covering the

ages exceeding the limits of the primary policy. The Drake court addressed the concerns raised by such a settlement as follows:

> [Appellant] also asserts that if a primary insurer is permitted to settle for less than its policy limits, plaintiffs and the primary insurer will make "token settlements." This concern is not well-founded. When, as in this case, plaintiffs agree to "swallow the gap" between the amount of settlement and the primary policy limits, their own self-interest generally will prevent them from reaching a token settlement.

*Drake,* 514 N.W.2d at 789.

After a thorough discussion of public policy considerations, the Drake court concluded that "[o]n balance, public policy considerations favor the enforcement of modified *Loy* releases in Minnesota." *Id.* at 790.

The Drake court left for

> [a]nother day * * * [the] argument regarding "umbrella insurers" and the rising cost of excess insurance if primary carriers can so easily shift the cost of defense to excess insurers.

*Id.* at 789.

"Another day" has come in this case. Just as the Drake court found *Loy* to be persuasive, we find persuasive a later Wisconsin case construing *Loy. Teigen v. Jelco of Wisconsin, Inc.,* 124 Wis.2d 1, 367 N.W.2d 806 (1985), involved an umbrella policy. Rejecting the argument that an umbrella policy must be treated differently from the primary policy in *Loy,* the Teigen court stated:

> If the issue of the existence of a true primary/excess insurance situation had been fundamental to our reasoning behind the *Loy* principle, then our holding

in *Loy* would not control in the present suit. However, that is not the case. The rationale behind our affirmance of the "Loy Release/Covenant Not To Sue" is not anchored to the issue of whether a true primary/excess insurance situation exists. The desirability of *Loy*-type agreements lies in the encouragement of partial settlements in future cases, thereby fostering effective and expeditious resolution of lawsuits. Partial settlements not only benefit the parties involved, but the justice system as a whole.

*Id.* at 7, 367 N.W.2d at 809–10.

We conclude that the *Teigen* rationale mirrors that of *Drake,* and that the public policy considerations of *Drake* and *Teigen* are identical. Certainly, the effective and expeditious resolution of lawsuits is a commendable goal; one fully consistent with the public policy of Minnesota. Indeed, as noted by the district court in this case, Minnesota has a history of approving and encouraging partial settlements of claims. *See Frey v. Snelgrove,* 269 N.W.2d 918, 921–22 (Minn.1978); *Kellen v. Mathias,* 519 N.W.2d 218, 223 (Minn.App.1994); *Klimek v. State Farm Mut. Auto. Ins. Agency,* 348 N.W.2d 103, 106 (Minn.App.1984).

We agree with the observation of the district court that

> the strong public policy expressed in *Schmidt v. Clothier* and in *Teigen,* takes precedence over the speculative argument that *Drake* settlements will increase the cost of umbrella coverage. It is unlikely that plaintiffs will settle claims against primary carriers for deep discounts simply to take a chance against the excess coverage. To conclude otherwise requires the assumption that plaintiffs and their attorneys will

owner of the involved vehicle was deemed to be "primary," and the policy covering the

driver of the involved vehicle was deemed to be "excess." 514 N.W.2d at 786.

frequently make decisions against their own best interests. It is more in keeping with the expressed policy of this state to encourage partial settlement of claims and prompt payment to injured parties.

The Drake court adopted the rationale of *Loy*. The Teigen court declared the public policy considerations of *Loy* to be equally applicable in cases involving umbrella policies. We conclude that the public policy considerations of *Drake* also should be equally applicable in cases involving umbrella policies.

## DECISION

■ The district court correctly determined that coverage under an umbrella policy becomes available when the injured party, the insured, and the primary insurer reach a settlement for less than the primary policy limits and the injured party agrees to absorb the gap between the settlement amount and the primary policy limits.

**Affirmed.**

GORDON W. SHUMAKER, Judge (dissenting).

I respectfully dissent and would reverse the summary judgment.

The majority focuses on the effect of the settlement between AMICA Mutual Insurance Company and the Francks and the Pennistons and applies the rationale of *Teigen v. Jelco of Wis., Inc.*, 124 Wis.2d 1, 367 N.W.2d 806 (Wis.1985):

The desirability of Loy-type agreements lies in the encouragement of partial settlements in future cases, thereby fostering effective and expeditious resolution of lawsuits. Partial settlements not only

benefit the parties involved, but the justice system as a whole.

*Id.* at 809–10.

Although this settlement undoubtedly benefited AMICA, the Francks, and the Pennistons, it surely did not benefit the umbrella insurer. Thus, the laudable goal of benefit to settling disputants is turned on its head if some of the parties can contrive to benefit themselves at the expense of a nonsettling party. Additionally, it is unlikely that the justice system is benefited in any respect by a judicial rewriting of the insurance contract to which insureds and umbrella insurer agreed.

Cincinnati agreed, through its insurance policy, to provide "[e]xcess insurance over and above the amounts provided for in basic policies * * *." It is undisputed that the "basic policy" applicable here is AMICA's primary liability policy with a $500,000 bodily injury limit.

Cincinnati's policy requires the insured to maintain basic coverage of $500,000, and provides: "We will pay only the amount which is more than the required basic policy limits and more than any other collectible insurance." If there is other insurance in addition to the basic policy, Cincinnati provides that "the other insurance will pay first and this policy will be in excess of the other insurance."

In deciding insurance coverage questions, courts must begin with a review of the insurance policy at issue because insurance policies, like other contracts, "are matters of agreement by the parties and the function of a court is to determine what the agreement was and enforce it." *Fillmore v. Iowa Nat'l Mut. Ins. Co.*, 344 N.W.2d 875, 877 (Minn.App.1984). As the majority notes, in ascertaining what the agreement was, courts must construe the policy according to the terms the parties have used and must give the policy language its ordinary and usual meaning so

as to give effect to the parties' intent as it appears from the contract. *Dairyland Ins. Co. v. Implement Dealers Ins. Co.*, 294 Minn. 236, 244–45, 199 N.W.2d 806, 811 (1972). Where there is no ambiguity in an insurance policy, there is no room for construction. *Id.* at 244, 199 N.W.2d at 811.

Cincinnati's umbrella policy provides only excess insurance coverage. As the Minnesota supreme court explained in *Jostens, Inc. v. Mission Ins. Co.*, 387 N.W.2d 161, 165 (Minn.1986), the significant features of umbrella coverage are: 1) the requirement that there be an underlying policy with a different insurer, 2) an express agreement between the insured and the umbrella insurer that the umbrella coverage will be available for claims that exceed the limits of the underlying insurance, and 3) the ability of the umbrella carrier to offer high limits for a modest premium because the underlying insurer absorbs most claims and the umbrella carrier's defense costs, which can be substantial, can be kept low.

The majority acknowledges that umbrella insurers are ordinarily liable for losses in excess of the underlying coverage, and that the term "excess" unambiguously means the amount by which one quantity exceeds another. Under the plain language of Cincinnati's umbrella insurance contract, there is no coverage available until a claim exceeds the limit of the underlying policy. Only in a fictional sense has the claim here exceeded the limit of the underlying policy.

The majority makes the same error that the district court made. Instead of beginning with the plain contract language and then enforcing the contract as agreed between the parties, the majority and the district court suggest that the enforcement of the contract will "nullify the intent of the settlement" and will "deprive the Pen-

nistons of the protection from person exposure that they bargained for in the agreement." I first note that the Pennistons did not bargain for the protection that the majority would now give to them. The Pennistons bargained for "excess" coverage, but such coverage has not yet been reached.

The focus of the district court and the majority is on upholding the intent of the settlement. To even reach that issue it is necessary to ignore the intent of the insurance contract.

The real effect of the settlement agreement is the unilateral de facto revision of the excess policy so as to thrust Cincinnati into the role of primary carrier.

The majority relies on *Drake v. Ryan*, 514 N.W.2d 785 (Minn.1994), and the policy rationale in *Schmidt v. Clothier*, 338 N.W.2d 256 (Minn.1983), in determining that exhaustion of a primary policy is not always necessary to reach excess coverage and in presenting the public policy goal of encouraging settlements. Neither case is sufficiently analogous to offset the rule that the plain language of the excess policy is to be honored and given effect.

*Drake* involved two insurers who agreed in their respective policies to provide primary coverage, and one of the insurers also agreed to provide excess coverage for a non-owned insured vehicle. *Id.* at 786. The supreme court expressly declined to rule on the issue squarely presented here:

> We leave for another day James Ryan's argument regarding "umbrella insurers" and the rising cost of excess insurance if primary carriers can so easily shift the cost of defense to excess insurers. State Farm is not an umbrella carrier.

*Drake*, 514 N.W.2d at 789.

So, *Drake*, not having an umbrella insurance policy to construe, had no occasion to be concerned about whether umbrella excess insurance could be reached if cover-

age still remained under the primary policy.

In *Schmidt*, the supreme court held that, for purposes of determining underinsured motorist coverage, "[e]nforcement of policy exhaustion clauses would produce results contrary" to the no-fault insurance act. *Schmidt*, 338 N.W.2d at 260. Although some general legal principles are likely applicable to all insurance contracts, the no-fault act incorporates specific public policies that serve as limitations on automobile insurance. Thus, while exhaustion clauses in automobile policies violate the public policies expressed in the no-fault act, there might be no such public policy considerations in other insurance contexts. Thus, *Schmidt*, having been decided in a no-fault context, is not persuasive authority for any proposition here.

I believe the district court erred in not construing the Cincinnati umbrella policy according to its plain and ordinary language. The effect of that error was to convert an excess insurance policy to a de facto primary policy, in contravention of the contract language, and to shift duties and costs to the excess carrier where that carrier had no obligation to assume the duties or pay the costs. I would reverse.